**BUCKO CONSTRUCTION COMPANY, INC., Appellant–Petitioner,**

v.

**INDIANA DEPARTMENT OF TRANSPORTATION, et al., Appellees–Respondents.**

**No. 45A03–0507–CV–325.**

Court of Appeals of Indiana.

July 21, 2006.

Gerald M. Bishop, Esq., Stephen Bower, Cohen & Thiros, P.C., Merrillville, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

In November 1996, the Indiana Department of Transportation (INDOT) reviewed Bucko Construction Company, Inc.'s (Bucko) performance as a contractor with the State and, based on Bucko's deficient performance on Contract R–20974 (the

Contract), reduced Bucko's prequalification rating for highway construction projects by thirty percent. Bucko administratively appealed the reduction and, after its administrative remedies proved unsuccessful, sought judicial review in December 1998. While the judicial review action was pending, Bucko filed a complaint against INDOT for alleged violations of the Contract. Thereafter, Bucko supplemented the record in the Lake Superior Court judicial review action by submitting the judgment from the Marion Superior Court contract case. In affirming INDOT's decision to reduce Bucko's prequalification rating, the Lake Superior Court refused to consider the judgment of the Marion Superior Court. On appeal, Bucko claims the Marion Superior Court judgment was controlling and should have been considered in the judicial review action.[1]

We affirm.

Bucko is an Indiana corporation engaged in the business of heavy highway contracting and bituminous asphalt paving. In February 1994, Bucko entered into the Contract with INDOT for interstate rehabilitation and bridge reconstruction on a portion of I–65 in Jasper and White Counties. The contract was to be completed in two phases. Phase I involved the outside (or driving) lanes of the interstate, while Phase II involved the inside (or passing) lanes. The Contract specified that the phases would be completed on July 31 and November 1, 1994, respectively. The final completion date was to be November 15, 1994.

On Phase I of the project, Bucko was given a time extension to August 13, but did not complete the phase until September 16. Similarly, on Phase II, INDOT extended the completion date to November 18, but the phase was not complete until November 22, 1994. Although substantially complete at the end of Phase II, the overall project was not finally complete and accepted until September 24, 1996.

John Shaw was the project engineer employed by INDOT and assigned to oversee the project. Throughout work on the project, which began in April, Shaw encountered numerous problems with Bucko's performance. These included delays, an unusually high number of failed materials tests, frequent equipment failures, plant shutdowns, and the use of materials from unapproved sources. In addition to monitoring Bucko's progress, Shaw was also responsible for evaluating Bucko's work throughout the course of the project. As part of his evaluation, Shaw had the responsibility for preparing CR–2 reports, which are submitted to INDOT's prequalification committee for consideration of contractors' qualifications and performance capacity ratings. In general, a CR–2 report is prepared only at the completion of a project. Interim CR–2 reports may be prepared, however, to address problems

---

1. In the alternative, Bucko briefly asserts in its appellate brief that the reduction was arbitrary and capricious and not supported by substantial evidence because any flaws in its work under the Contract were de minimus. Bucko seemed to abandon this argument at oral argument, which was held in Indianapolis on June 8, 2006. Moreover, we observe that Bucko failed to provide us with the administrative record (except for ten pages of transcript) and, in support of its argument, simply directs us to the proposed findings of fact it submitted to the administrative law judge (the ALJ). Bucko's failure to support its argument with citation to evidence from the administrative record is improper. Without the complete administrative record, we cannot adequately review the factual determinations of the administrative agency. Moreover, we observe that a party may not incorporate by reference an argument not made in its appellate brief. See Ind. Appellate Rule 46(A)(8) (appellant must support each contention with an argument, including citations to legal authorities, statutes, and the record for support); Byrd v. Am. Fed'n of State, County, & Mun. Employees, Council 62, 781 N.E.2d 713 (Ind.Ct.App.2003), trans. denied.

during construction. Shaw prepared two interim CR–2 reports during the project.

The first interim CR–2 report, issued July 12, 1994, was precipitated by a particular incident when Bucko used sand from an unapproved source, requiring a plant shutdown. Shaw was especially concerned because Bucko had recently done this on another contract with the State. On the CR–2 report, Shaw gave Bucko "unsatisfactory" or "2" ratings for "workmanship and voluntary conformance with specs and standards" and "attitude toward the Engineer and Department regulations."[2] In addition to the incident with the sand, Shaw noted that there had already been seven failed material tests. He also gave Bucko an unsatisfactory rating for the condition of its construction equipment, which had broken down on numerous occasions and disrupted production. Finally, Shaw rated Bucko low on rate of progress, noting that Phase I was 12% behind schedule and opining that it would be "very difficult to complete phase on time." *Id.* at 344.

Just prior to the interim CR–2 report, the area engineer, Samuel Huckleberry, sent a letter to Bucko expressing INDOT's concern with delays on the project. After indicating that the project was 13% behind schedule, Huckleberry requested that Bucko "furnish a revised progress schedule" and indicated, "prompt submission of the revised chart is essential." *Id.* at 356. Bucko never furnished a revised schedule.

**2.** A contractor's performance is rated in a number of areas on the CR–2 report using the following rating scale:

6 Excellent, premium rating (to be used only for exceptional performance)

5 Good performance as desired and expected (a full credit rating)

4 Acceptable, meets minimum standards

3 Occasionally is not up to minimum standards (Sometimes the work may be unsatisfactory)

2 Unsatisfactory, appropriate remarks are to accompany this low rating

By August 25, 1994, Shaw had serious concerns with the completion of Phase I by Labor Day and of the overall project by the end of the season. He communicated these concerns to Bucko in a letter.

In particular, [Shaw] projected that, based on Bucko's 650 ton per day average for laying material, the project would not be completed in time. [Shaw] considered this rate of production to be low and that it was caused by equipment failures and plant shut downs. [Shaw] also noted in this letter that the project was 55% compete even though the projected time for the project was nearly 70% complete. Finally, he noted his concerns that the delays would cause with respect to paving, concrete, pavement markings, and seeding during the colder months of November and December. [Shaw] did not receive a response to this letter, nor did INDOT ever receive a revised schedule as to how Bucko planned to complete the project on time.

*Appellant's Appendix* at 64. As set forth above, Phase I was completed September 16, 1994, more than one month after the revised completion date.

Shortly thereafter, on September 21, Shaw issued another interim CR–2 report. This time, Bucko received even lower ratings in several areas. The ALJ's findings[3] place particular emphasis on this report and provide as follows:

1 Wholly inadequate, appropriate remarks are to accompany this low rating.
*Appellee's Appendix* at 346.

**3.** The ALJ forwarded his proposed findings of fact, conclusions of law, and recommended order to the Commissioner of INDOT on January 27, 1998. Thereafter, on November 4, 1998, the Commissioner incorporated them by reference in his final order, affirming the reduction of Bucko's prequalification rating.

14. On September 21, 1994, shortly after the completion of Phase I, [Shaw] completed a second interim CR–2 report. He noted the foregoing problems. With respect to "Rate of Progress," he gave them an "unsatisfactory" or "2" rating, noting particularly the delay in completing Phase I and expressing his concern about completing the project overall by the end of the construction season. In a note to the report, Dan Carpenter [ (the district construction engineer) ] reiterated these concerns that "[t]here is every reason to believe that this project will not be finished this season as required." *[Appellee's Appendix* at 342.]

15. With respect to "workmanship and voluntary conformance with specs and standards," and "attitude toward the Engineer and Department regulations," [Shaw] gave Bucko "wholly inadequate" or "1" ratings ... which are a step lower than his July 12 ratings for those areas. The ratings were based on two factors: (1) being observed blending # 9 aggregate from Vulcan at Monon to the stockpile of # 9's from Vulcan at Francesville," [sic] and (2) the existence of 10 failed material reports, including the failure and removal of 460 tons of 5C base.

16. Regarding failed materials, there were a total of 10 failed material reports for bituminous mixtures during Phase I.... Both Brenda Hadley [ (an INDOT employee assigned to test materials at the plant) ] and [Shaw] testified that, based on their experience, this was an inordinate amount of failures for a project.

17. One of these failures, regarding 460 tons of 5C base, was a matter of serious concern. Typically, a failure is not determined until after the material has been loaded at the plant, shipped to the job site, and placed on the road. While materials place on the road may fail, meaning they do not meet specifications, INDOT may allow the material to remain if it falls with [sic] an acceptable percentage range.... For example, a lower range, such as 10% or 20% might be acceptable. However, in this case, [the percentage was as high as 95 or 115%].

18. According to Tom Konieczny [ (district materials and tests engineer) ], this percentage represents a significant failure. He described such a mixture as not well blended and lacking in cohesion so that the course [sic] and fine aggregates pull apart. It is as though an essential ingredient is missing....

19. It is not simply the number of failed material reports but their severity which support [Shaw's] low ratings for "workmanship and voluntary conformance with specs and regulations." As [Shaw] testified, it is not any single incident that caused him to rate Bucko poorly on the contract, but the accumulation of many incidents that led him to give low ratings to Bucko. In this case, he rated Bucko low in this area and in "Attitude toward the Engineer and Department regulations" not only because of the incident involving 460 tons of 5C base, but because of what he considered a "blatant disregard for INDOT specs" when Bucko blended the # 9 aggregates from Vulcan at Monon

with # 9 aggregates from Vulcan at Francesville. *[Id.* at 343.]

20. The significant failure of the 460 tons of 5C base, the provision of sand twice from unapproved sources, and the inappropriate blending of aggregates are clear examples of failure to meet specifications. [Bucko] admits its Plant Operator, Allan Sassman, was not properly trained and had not been employed on the job long. Bucko, not INDOT, is responsible for the competence of its employees and for their mistakes. These problems are serious and support [Shaw's] low ratings for "workmanship."

21. On the September 21 interim report, [Shaw] also gave Bucko an "unsatisfactory" or "2" rating for "planning and scheduling of job sequences and material delivery." Part of [Shaw's] concern was the problems with plant shut downs. The other concern was the events of September 1, 1994 in which Bucko had problems with plant operations, causing delays in delivery of materials to the job site, thereby causing Bucko to work late into the night. . . .

*Appellant's Appendix* at 66.

Upon reviewing the interim CR–2 reports, the prequalification committee issued a warning letter to Bucko on October 21, 1994, via INDOT's chief highway engineer, Donald Lucas. In the letter, Lucus observed that the recent CR–2 report was even worse than the first. After detailing each deficient rating, Lucas continued:

Rate of progress has been poor, as documented by [Shaw]. In regard to the plant mix, INDOT testing personnel caught your firm hauling in sand from a source not on the Job Mix Formula (JMF). The paving was shut down until the problem was worked out. On a second occasion, testing personnel caught your firm hauling in number 9 stone from a source not on the JMF. The stockpile was considered contaminated and rejected before and [sic] material was used on the project. Mr. Bucko stated that these violations of the specifications were not intentional, but were the result of a mix up in communications. On several occasions, the asphalt plant ran out of needed material or fuel, causing delays. On September 1, 1994, it delayed switching of traffic until well after dark, causing a safety hazard. Equipment breakdowns slowed the rate of progress on the job. The asphalt plant needed repairs sixty percent of the days mix was produced, and most equipment used on the jobsite needed major repairs at one time. 105 IAC 11–2–1(f) of the Indiana Administrative Code (Rules of Prequalification of Contractors and Bidding) states:

"( [f] ) A contractor will first be given a tentative factor of one hundred percent (100%) in its aggregate and respective classified ratings. Each of these tentative factors may be reduced wholly or in part for the contractor's deficiencies in the following areas as determined from a summary of reports for field engineers, other investigations or an interview with the contractor, or both. The areas considered for qualification of the contractor include the following:

(1) Organization.

(2) Personnel.

(3) Construction experience.

(4) Prosecution of work on previous contracts.

(5) Quality of workmanship on contracts.

(6) Condition and adequacy of equipment.

(7) The contractor's attitude toward department rules, the general public, and equal employment opportunity requirements."

105 IAC 11–2–6(a) states:

"(a) The prequalification committee may recommend to the commissioner the suspension of the contractor's certificate of qualification if the contractor's work is unsatisfactory, if it is apparent the contractor will be unable to complete its contracts on time, or if the contractor has failed to adequately document a current or previous contract."

105 IAC 11–2–10(e) states:

"(e) A contractor that is not prequalified may be prohibited from performing subcontract work or limited in the dollar value thereof if the contractor has been found in violation of a rule that would subject a contractor to suspension, revocation, or reduction of its certificate of qualification."

Although no action was taken against your firm at this time, this warning should prompt you to improve on the areas outlined above, and thereby avoid reduction or suspension of your Certificate of Qualification in the future.

*Appellee's Appendix* at 424–25.

Bucko gained some ground during Phase II and completed the phase on November 22, 1994, only four days after the (revised) scheduled completion date. During and after Phase II, however, serious concerns arose regarding the quality of the road surface on the passing lanes. In this regard, the ALJ made the following findings:

22. With respect to Phase II of the project, INDOT's most serious concerns with Bucko's performance involve segregation of the surface and binder material and the related effect of raveling. This was the principal subject of [Shaw's] final September 30, 1996 CR–2 in which [Shaw] gave a "wholly inadequate" or "1" rating for "workmanship and voluntary conformance with specs and standards" as a result of these problems.

23. There were three incidents involving segregation or problems with surface materials supporting this rating. First, on October 25, 1994, Bucko fully acknowledged and immediately removed approximately 1600 feet of segregated material from the road caused by "screed segregation".... Second, problems with the laying of Bucko's surface in the southbound lane became evident on November 9, 1994 after a semi-trailer overturned on the southbound driving lane[, which required traffic to be diverted onto the passing lane.] The surface had been placed on November 3, 1994 which was sufficient time to allow the material to harden and bear vehicle traffic. Despite this, the passing lane in this area quickly deteriorated.

24. The third incident was the most serious. Shortly after work was completed for the season and traffic allowed to travel on the passing lanes, the road surface began to ravel, which means the aggregate separated as a result of the constant friction from vehicle travel. [Shaw] first noticed this problem in December, 1994, but the problem became worse over time up to September, 1996 when Bucko repaired it....

25. Evidence is conclusive that surface problems did exist on the passing lanes of the project. Though the parties disagree on what to call these surface problems or their extent, evidence is clear that the problem was serious enough to

cause rapid deterioration of significant portions of the surface, or raveling. This is a serious concern regarding "workmanship" and supporting [Shaw's] low rating in that area. Because of the obvious poor condition of the surface, such a rating is justified.

*Appellant's Appendix* at 66.

Soon after completion of Phase II, the parties became embroiled in a dispute regarding the condition of the passing lanes. Bucko apparently took the position that it was not at fault for the alleged condition of the passing lanes. Bucko also disputed the extent and type of repairs requested by INDOT. After a significant period of time, Bucko eventually repaired the passing lanes [4] and the project was completed in September 1996. The ALJ made the following findings in this regard:

26. Although [Shaw] was not aware of the legal dispute between INDOT and Bucko regarding the segregation, he was aware of the operational effects of that dispute on the roadway. That is, the road continued to deteriorate between November, 1994 and September, 1996. In recognition of Bucko's concerns, INDOT did suspend chargeable days from April 1, 1995 to July 5, 1995 to allow time to resolve the dispute. Evidence shows that INDOT negotiated with Bucko to reduce the number of markings of segregated areas that INDOT wanted repaired or replaced. INDOT also provided Bucko various options for correcting the problem, including milling and replacing certain areas and micro surfacing. However, evidence is clear that Bucko did not voluntarily conform with INDOT's requests, even after extensive negotiation to reduce the amount of work expected, and that the legal threat of default and turning the contract over to the bonding company compelled Bucko to finish the job in September, 1996. The 1993 Standard Specifications are clear that the contractor is responsible for removing segregated materials when directed by INDOT.

27. Bucko's claim that INDOT bears responsibility for the problems with segregation due to its phasing of the project is not supported by the evidence. First, Bucko bid on the project and knew how the project was phased before it bid. Second, Bucko is wholly responsible for the delays in Phase I of the project, resulting in a delay in completion in excess of a month. Third, Bucko's claim that colder weather conditions at the time of laying the material in Phase II caused the segregation is not proven....

28. Evidence also does not support Bucko's suggestion that the existence of material on the roadway that does not meet specifications is not serious. Bucko relies on what it suggests are relatively minimal penalty assessments for failed materials. However, the fact remains that over twenty (20%) of the current roadway surface does not meet specifications. Based on Rick Yunker's experience as an engineer with INDOT, the roadway that INDOT ultimately accepted was less than what was required under the contract and the design life of the

---

**4.** At INDOT's request, Bucko removed and patched the defective areas and then hired a subcontractor to microsurface the entire length of the northbound and southbound passing lanes.

roadway has been significantly reduced as a result.

*Id.* at 66–67 (exhibit citations omitted).

On December 14, 1998, Bucko sought judicial review of INDOT's decision to reduce its prequalification rating by thirty percent, claiming, among other things, that the reduction was arbitrary and capricious and not supported by substantial evidence. About a month later, Bucko filed a complaint against INDOT, alleging INDOT breached the Contract in several respects.[5] While the judicial review action was pending in the Lake Superior Court, on September 3, 2003, the Marion Superior Court issued a judgment favorable to Bucko in the contract case (the Marion County judgment). Thereafter, Bucko supplemented the record in the judicial review action with the Marion County judgment, which INDOT was in the process of appealing. On September 21, 2004, our court issued a memorandum decision in which we affirmed the Marion County judgment in part, reversed in part, and remanded. *See INDOT v. Bucko Constr. Co., Inc.*, 816 N.E.2d 97, No. 49A04-0311-CV-583. Our Supreme Court denied INDOT's petition for transfer on March 30, 2005.

In the judicial review action, the court finally issued its judgment on June 15, 2005, affirming the agency's reduction of Bucko's prequalification rating. In its written order, the court expressly refused to consider the Marion County judgment, explaining as follows:

Bucko has also filed a supplemental record with this court. The supplemental record includes a decision of the Marion Superior Court in a companion case filed by Bucko against INDOT. The Marion Superior Court case arises from a project/contract that is a central part of the present controversy. The Marion Superior Court judgment, however, was not part of the record before the administrative law judge, and Bucko has not demonstrated authority for this court to consider that judgment. Therefore, this court may not consider the judgment of the Marion Superior Court in rendering its decision on this appeal.[ [6]]

Appellant's Appendix at 8.

On appeal, Bucko claims that the judicial review court erred in failing to consider the Marion County judgment. Bucko raises a number of theories in support of this contention, including law of the case, invited error, judicial admission, collateral estoppel, and res judicata. INDOT responds that these theories have no application in this case and that the judicial review court was bound to consider only the record before the ALJ.[7]

---

**5.** In particular, Bucko claimed INDOT was responsible for the microsurfacing expense in the amount of $120,000, INDOT improperly assessed liquidated damages, and INDOT owed interest on monies it withheld from Bucko.

**6.** In a footnote, the court stated:

This court recognizes that there is some logic to Bucko's point about the inconsistency of the administrative determination and the decision of the Marion Superior Court. Yet, as INDOT points out, the decision of the Marion Superior Court concerned a different set of issues and a different record of evidence. This court also notes that the decision of the Marion Superior Court has apparently been affirmed in part, and reversed in part, in an unpublished memorandum opinion dated September 21, 2004 that is not part of the record in this court.
*Appellant's Appendix* at 8.

**7.** INDOT also argues in its appellate brief that Bucko waived these claims by failing to present them below. At oral argument, however, INDOT appeared to abandon this argument, and Bucko represented that it attempted to raise these claims below, but the judicial review court would not consider them. Therefore, we will proceed to the merits of Bucko's appeal.

Judicial review of an administrative decision is limited. *Indiana Dep't of Natural Res. v. United Refuse Co., Inc.,* 615 N.E.2d 100 (Ind.1993); *see also Regester v. Indiana State Bd. of Nursing,* 703 N.E.2d 147, 150 (Ind.1998) ("relief may be granted only under fairly serious circumstances, such as arbitrary and capricious action or the absence of substantial evidence"). Specifically, a court reviewing an administrative decision is limited to determining whether the agency's action was:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

Ind.Code Ann. § 4–21.5–5–14(d) (West 2002). The judicial review proceeding is not intended to be a trial de novo, as the role of fact finder rests with the ALJ.[8] *Indiana Dep't of Natural Res. v. United Refuse Co., Inc.,* 615 N.E.2d 100. Rather, the court simply analyzes the administrative record as a whole to determine whether the administrative findings are supported by substantial evidence. *Id.* "Consequently, the trial court acts as an appellate court when it reviews an administrative order." *Id.* at 103.

I.C. § 4–21.5–5–11 (West 2002) specifically provides:

Judicial review of disputed issues of fact must be confined to the agency record for the agency action supplemented by additional evidence taken under section 12 of this chapter. The court may not try the cause de novo or substitute its judgment for that of the agency.

Thus, review of an agency's decision must be confined to the record that was before the agency, except in limited circumstances that do not apply here. *See Indiana Educ. Employment Relations Bd. v. Tucker,* 676 N.E.2d 773 (Ind.Ct.App. 1997). Further, the reviewing court should neither substitute its judgment on factual matters for that of the agency, nor reweigh the evidence. *IDEM v. Adapto, Inc.,* 717 N.E.2d 646 (Ind.Ct.App.1999).

In the instant case, Bucko requested the judicial review court to look outside the administrative record. In effect, Bucko asked the court to substitute its judgment, or more precisely the judgment of the Marion Superior Court, for that of the administrative agency. The judicial review court properly rejected this request.

We observe that the hearing before the ALJ was held well before Bucko filed its breach of contract claim against INDOT. In fact, the administrative review process was complete and Bucko had already filed for judicial review. Therefore, as Bucko observes in its appellate brief, it was impossible for the Marion County judgment to be part of the administrative record.

Without a doubt, two fact-finders considering the same evidence can arrive at different findings of fact and conclusions, each supported by substantial evidence. We reiterate, however, that a court reviewing an agency decision:

must defer to the administrative findings of fact and may not overturn the

---

8. In some agencies the ALJ is not the ultimate authority, but instead makes proposed findings and a recommended order to the agency's ultimate authority, here, the INDOT Commissioner. This, however, does not relieve the ALJ from the obligation to serve as trier of fact in the administrative hearing. *Indiana Dep't of Natural Res. v. United Refuse Co., Inc.,* 615 N.E.2d 100.

expert conclusions of the agency merely because the court itself may have drawn different conclusions. The trial court sits as a court of appeal, and cannot retry the facts and come to its own conclusions on the merits of the case. The court is limited to a consideration of whether there was substantial evidence to support the determination, whether there was an abuse of discretion, and whether the determination was arbitrary and capricious or contrary to law, as revealed by the uncontradicted facts. *State v. Carmel Healthcare Mgmt., Inc.*, 660 N.E.2d 1379, 1384 (Ind.Ct.App.1996), *trans. denied.* Therefore, even assuming for the sake of argument that the same facts and issues were subsequently determined in the Marion County litigation, the Marion County judgment cannot be substituted for that of the agency any more than the judicial review court can substitute its judgment for that of the agency. Therefore, Bucko's claim that the Marion County judgment should have controlled the judicial review action is without merit.[9]

■ Finally, we feel compelled to observe that even if the decisions from Marion County litigation had been considered, they would not have had the controlling effect suggested by Bucko. In fact, those decisions say little or nothing that would be relevant to a review of the administrative findings. Contrary to Bucko's assertions on appeal, neither the court of appeals nor the trial court found that Bucko's performance under the Contract was satisfactory. On the contrary, the passing lanes were clearly unacceptable due to segregation and raveling. The Marion County litigation merely allocated the remediation costs between the parties.

With respect to the Marion County judgment, Bucko represents that the trial court made a "legal determination ... as to fault or responsibility for the design flaws for the I–65 project". *Appellant's Brief* at 14. This is simply not true. The court said nothing about design flaws (a claim that was asserted by Bucko). Rather, the court held INDOT responsible for two-thirds of the remedial costs because "IN-DOT knew or should have known of the *problems with the workmanship* early on in the paving process but failed to notify

---

9. The fundamental flaw in Bucko's arguments on appeal is its belief that the judicial review court allowed INDOT to "relitigate the performance issues determined in the Marion County litigation." *Appellant's Brief* at 12. On the contrary, these issues had already been litigated during the administrative review proceedings. To the extent any issues were relitigated, that occurred in the Marion County litigation. INDOT correctly observes that theories of collateral estoppel, law of the case, and res judicata have no application here.

We briefly address Bucko's claim that IN-DOT is estopped from denying the preclusive effect of the Marion County litigation based upon a specific representation made by IN-DOT to the judicial review court. In a Verified Motion for Continuance of Status Conference, filed on September 29, 2003, INDOT informed the trial court of the recent entry of the Marion County judgment, which counsel

represented was "based on the same facts", and stated, "counsel for both parties believe that when the Marion Superior Court judgment becomes final, the issues in this case would become moot." *Appellant's Appendix* at 72. This representation to the judicial review court certainly gives us pause. We cannot agree with Bucko, however, that the judicial review court was somehow bound to (improperly) consider the Marion County judgment simply because of counsel's erroneous representation. *Cf. Waugh v. Kelley*, 555 N.E.2d 857, 859 (Ind.Ct.App.1990) ("[w]hile Kelley perhaps suffered a mild attack of 'foot in mouth' disease in the trial court, his admissions in this regard could not turn services which as a matter of law are not essentially legal in character into services which can only be performed by lawyers in this state, as the trial judge obviously and correctly found").

Bucko of the extent of the problems early on." *Appellant's Appendix* at 86 (emphasis supplied).

Moreover, the court of appeals affirmed the apportionment of remedial costs on a different ground. The court did not address fault, as Bucko would have us believe, but merely interpreted the Contract:

. Given this evidentiary dispute, the trial court could have concluded that, while the sections of roadway that were raveled were unacceptable, the Contract only envisioned "removal and replacement" of the unacceptable work, not removal and replacement of the entire north and southbound passing lanes. Indeed, such an interpretation is consistent with the language of the 1993 Standard Specifications, which requires the removal and replacement of the "unsatisfactory materials." Microsurfacing is not mentioned in the Contract or in the 1993 Standard Specifications. Had INDOT intended that any isolated repairs would also have to be microsurfaced, it should have included language to that effect in the Contract or in the Specifications.

Instead, Rick Yunker, another materials engineer with INDOT, marked 106 areas for removal on the southbound passing lanes, totaling 3,320 feet of the 3.8–mile roadway. Yunker marked twenty-five areas for removal on the northbound passing lane, totaling 533 feet of the 3.8–mile roadway. Bucko's cost for milling and patching these sections prior to microsurfacing amounted to $19,884.87. Accordingly, the trial court's apportionment of $67,489.77 of the $101,335.99 cost of patching and microsurfacing was not contrary to the terms of the Contract and was not clearly erroneous.

*INDOT v. Bucko Constr. Co., Inc.*, 816 N.E.2d 97 No. 49A04-0311-CV-583, slip op. at 10–11 (Ind.App.2004) (record citation and footnote omitted).

In summary, we conclude that the judicial review court properly confined its review to the administrative record. Moreover, even if considered, the Marion County litigation sheds no significant light on the adequacy of the administrative findings and the resulting reduction of Bucko's prequalification rating. As set forth in detail above and in the ALJ's findings, the project was plagued with problems (e.g., delays, equipment failures, material failures, the use of unapproved materials, and plant shutdowns) well before the dispute arose regarding segregation and raveling of the passing lanes, as evidenced by the interim CR–2s and the warning letter issued by the prequalification committee during Phase II of the project. Further, it is evident that surface problems arose on the passing lanes soon after Phase II was completed, causing rapid deterioration of significant portions of the surface and requiring repair. The fact that the contract only required removal and replacement of the defective portions of roadway and not microsurfacing does not alter the ALJ's extensive findings regarding the inadequacy of Bucko's performance throughout the contract and the deficient quality of its finished product. The judicial review court properly affirmed INDOT's decision to reduce Bucko's prequalification rating.[10]

Judgment affirmed.

MAY, J., and CRONE, J., concur.

---

**10.** In its reply brief, Bucko raises a due process claim for the first time, arguing that INDOT was not impartial when it acted in a quasi-judicial capacity and reduced Bucko's rating. This argument is waived because Bucko failed to raise the issue in its appel-

lant's brief. *See* Ind. Appellate Rule 46(C) ("[n]o new issue shall be raised in the reply brief"); *Wheatley v. Am. United Life Ins. Co.,* 792 N.E.2d 927 (Ind.Ct.App.2003), *trans. denied.*